IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| CITY OF GREENVILLE, TEXAS, | § § § | |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, L-3 Communications Integrated Systems L.P. ("L-3"), files its Original Complaint against defendant, City of Greenville, Texas ("City"), and in support thereof respectfully states:

**I. INTRODUCTION AND SUMMARY**

1.      Plaintiff L-3 is a U.S. defense contractor that operates a major aircraft maintenance and modification facility primarily for various branches of the United States Armed Forces at an airport located in Greenville, Texas, commonly known as "Majors Field," as shown on the "Airport Layout Plan" attached hereto as Exhibit A (as modified from time to time, the "Airport Property"). This "Airport Layout Plan" was prepared by the City, with the assistance of L-3, for the Texas Department of Transportation ("TxDOT"), acting for and on behalf of the Federal Aviation Administration ("FAA"), as required under certain grant agreements ("Grant Agreements") between the City, as sponsor, and TxDOT, acting for and on behalf of the FAA.

2.      The City owns the Airport Property and leases part of it to L-3. The facility originated as a United States government flight training center during World War II, and after the

war the United States government transferred its interest in the Airport Property to the City.  The City has leased the Airport Property to L-3 and its predecessors since 1951.

3.	In short, the City's use of the Airport Property is subject to and constrained by federal law, including the Surplus Property Act (as defined below) and other statutes passed by the United States Congress; the terms, conditions and restrictions under which the United States government transferred its interest in the Airport Property to the City; FAA policies and regulations; and the provisions of the Grant Agreements.  Among other things, the City is required to use the Airport Property as a public use airport, and is also required to allow United States government aircraft to use the airport runway.  Likewise, the City's use of revenues obtained from the Airport Property is also limited to specific purposes as set forth in the Grant Agreements and other federal law, in short, that such revenues must be used for the operation and improvement of the Airport Property, and not for general budget purposes.  Moreover, under federal law the Airport Property must be used indefinitely as a public use airport, and the revenue-use requirement likewise applies indefinitely.

4.	However, the City refuses to admit that the Airport Property is subject to the Surplus Property Act and otherwise has not acknowledged or recognized that it is bound by federal law, including the restrictions of the agreement under which the United States government transferred the Airport Property to the City.

5.	Moreover, recently the City has taken actions, and has shown an intent to take further actions, that are not consistent with the federal restrictions which apply to use of the Airport Property and to revenues obtained from the Airport Property.  By way of example only, the City has recently denied that the Surplus Property Act pertains to the United States government's conveyance of its interest in the Airport Property to the City, or to the right of

United States government aircraft to land on the runway at the airport. The net result of such efforts by the City, if successful, would be to harm L-3's operations at the airport, and as a result the use of the airport by United States aircraft would be hindered – a net result contrary to both the intent and the express provisions of federal law.  In addition, the City is using revenues from the Airport Property for purposes other than the operation and improvement of the Airport Property – contrary to the requirements of federal law.

6.Accordingly, L-3 brings this suit requesting, *inter alia*, declaratory relief that the Airport Property is subject to the Surplus Property Act; that the Airport Property must be used indefinitely as a public use airport, as defined under federal law; that the City must allow itinerant aircraft owned by the United States government, or operated by its agents or employees, to use the Airport Property in common with others; and that all revenues from the Airport Property (excluding ad valorem property taxes) must be used for the operation and improvement of the Airport Property.

## II.  THE PARTIES

7.Paragraphs 1-6 set forth above are hereby incorporated by reference.

8.Plaintiff, L-3, is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 10001 Jack Finney Boulevard, Greenville, Texas 75402.

9.Defendant, City, is a municipality incorporated under the laws of the State of Texas.  The City may be served with process by serving the Mayor, Tom Oliver, or the City Secretary, Debra Newell, at Greenville City Hall, 2821 Washington, Greenville, Texas  75401.

## III.  JURISDICTION AND VENUE

10.Paragraphs 1-9 set forth above are hereby incorporated by reference.

11. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.

12. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 as the judicial district in which the City is located, and the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which the property that is the subject of this action is situated.

## IV. BACKGROUND FACTS

13. Paragraphs 1-12 set forth above are hereby incorporated by reference.

### A. History and Description of the Airport Property

14. The Airport Property originated as a United States Army Air Force World War II flight training center constructed through the joint efforts of the federal and local governments, opening on June 26, 1942. The Airport Property at times housed up to 5,000 pilots and support personnel during the war.

15. After the war, the United States and the City entered into an agreement dated June 19, 1947 (the "1947 Agreement"), also known as the No. 2747 Agreement, under which the federal government, acting by and through the War Assets Administrator, assigned its leasehold interest in the Airport Property and granted ownership of all improvements it had constructed to the City. However, the United States retained the right to use the airport without charge and to take back the property in the event of a national emergency or in time of war. The 1947 Agreement was entered into pursuant to Executive Order 9689 (January 31, 1946) and the Surplus Property Act of 1944 (the Surplus Property Act, as amended, is now codified at 49 U.S.C. §§ 47151-47153).

16. The City evaluated possible productive uses for the Airport Property, and on February 28, 1951, entered into an agreement (the "1951 Lease") to lease the Airport Property to

a predecessor of L-3: Texas Engineering and Manufacturing Company ("TEMCO"), an aircraft manufacture, overhaul and modification company then based in Grand Prairie, Texas. TEMCO's objective was to use the facility to perform aircraft modification and maintenance contracts for the United States Air Force.

17. Among other things, the 1951 Lease recognized that the lease was in all respects "subject and subordinate to all the terms and conditions" of the 1947 Agreement and other instruments under which the City acquired property from the federal government (*i.e.*, including a covenant that all uses are "public airport uses," see paragraph 31 hereinbelow).

18. TEMCO and its successors by merger or asset sale (*viz.*, Ling-TEMCO Electronics, LTV, E-Systems, Inc., Raytheon, and now L-3) have continuously leased and operated the Airport Property under the 1951 Lease and a successor lease entered into by and between the City and E-Systems, Inc. effective October 1, 1977 (as amended, modified or restated from time to time, the "1977 Lease"), which has been amended on five occasions and is described in greater detail below.

19. From the inception of the 1951 Lease to the present, the Airport Property has served both as a public, municipal airport for the City and as an aircraft modification, finish-out, and servicing center for domestic and international military and governmental aircraft.

20. L-3 and its predecessor lessees over the years have been responsible for the construction at the Airport Property of substantial improvements. In some instances, the City or other governmental units, including the United States government, have provided or facilitated bond financing or grant funds for construction; in other instances, L-3 or its predecessors simply paid for new improvements or substantial upgrades and modifications of existing improvements.

21. The City has been the beneficiary of all the Airport Property construction activity, as it has always owned fee simple title to all improvements leased by L-3 at the Airport Property. The City leases the Airport Property and improvements to L-3 in exchange for periodic rental payments and substantial other consideration, including L-3's financial and operational responsibility for the operation and maintenance of the municipal airport and its infrastructure.

## B.   The 1977 Lease

22. The 1977 Lease grants to L-3 (i) nonexclusive use of approximately 720 acres of the Airport Property to be used as a public-use municipal airport, including improvements such as runways, a control tower, a passenger terminal, an instrument landing system, and other improvements typically associated with a municipal airport (collectively defined in the 1977 Lease as the "Base Facilities"); and (ii) exclusive use of an approximately 661-acre portion of the Airport Property, including improvements such as maintenance facilities, hangars, fabrication facilities, and design/engineering facilities, which is devoted to L-3's aircraft systems integration operations (collectively defined in the 1977 Lease as the "Maintenance Premises").

23. Consistent with the City's obligations to the United States government under the 1947 Agreement, the City in Section 2.9 of the 1977 Lease explicitly recognized that aircraft servicing facilities at the Airport Property were integral components of the public transportation facilities at the Greenville municipal airport:

> [Certain contemplated Airport Property improvements for aircraft servicing facilities] are recognized by the parties and are hereby declared to be acquired and shall be used for public and governmental purpose and as matter of public necessity as contemplated by and defined in the Texas "Municipal Airport Act", the Bonds [to be issued by the City to finance the improvements] shall therefore relate to public projects and facilities to be owned by the City and to be operated on its behalf.

.

**C.     Federal Restrictions on Airport Operations**

24.     In the 1947 Agreement, by which the United States government transferred the Airport Property to the City, Section 5 states as follows:

> 5.     That by the acceptance of this instrument or any rights hereunder, the said party of the second part [*i.e.*, the City], for itself, its successors and assigns, agreed that the aforesaid surrender of lease and transfer of structures and improvements shall be subject to the following restrictions, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Executive Order 9689, and applicable rules, regulations and orders;
>
> (a)     That the aforesaid leased premises and the structures and improvements hereinabove transferred, which together shall hereinafter be called the "airport", shall be used for public airport purposes and only for such purposes, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of Section 303 of the Civil Aeronautics Act of 1938 [relating to runways, etc.].  Nothing herein shall restrict the use of buildings and improvements not conveyed hereby.  As used herein "public airport purposes" shall be deemed to include use of the structures conveyed hereby, or any portion thereof, for manufacturing or industrial purposes. . . .

25.     Moreover, in the 1947 Agreement the United States government reserved the right to have itinerant aircraft owned by the United States of America, or operated by any of its employees or agents on Government business "use the airport in common with others."  1947 Agreement, § 6(c).  Additionally, the United States government reserved the right, in the event of an emergency, to the full unrestricted possession, control and use of the landing area, building areas and airport facilities at Majors Field. *Id.*, § 6(d).

26.     Similarly, pursuant to Public Law No. 80-289 (the 1947 amendment to the Surplus Property Act), the United States government has the right at all times to make nonexclusive use of the landing area at Majors Field without charge, because Majors Field is an airport where federal surplus property is located.

27. Consequently, L-3's rights to the Airport Property under the 1977 Lease are subject to the rights of the United States government to take control over the Airport Property and to land aircraft at Majors Field. Accordingly, L-3 must maintain the general aviation airport runway not only for civilian aircraft pursuant to the 1977 Lease, but also at a level sufficient to allow United States military aircraft to land at Majors Field. L-3's presence on the Airport Property and operation of the runway system are critical to maintaining compliance with the Surplus Property Act. For example, the control tower, rotating beacon, control of runway lights, and portions of AWOS (aviation weather observing system) are all located on the Airport Property leased by L-3.

28. In short, the general aviation airport cannot function as a federally obligated airport without factoring in the Airport Property leased by L-3. Accordingly, under the Grant Agreements federal funds are frequently granted to the City for technological advancements and to maintain a sufficiently sized runway to service United States government aircraft. Much of the state-of-the-art equipment at Majors Field is controlled by the control tower, which is located on L-3's leased property and run by L-3 employees.

29. However, when the City was recently requested to admit that the United States government conveyed its interest in the Airport Property to the City pursuant to the Surplus Property Act, the City refused to admit this proposition and instead denied it. Similarly, the City has denied that the Surplus Property Act pertains to the right of aircraft owned by the United States government or operated by its employees or agents to land on the runway at Majors Field.

**D.   Federal Restrictions on Use of Airport Revenues**

30. Under the Airport Improvement Program ("AIP"), pursuant to the Airport and Airway Improvement Act of 1982 ("AAIA"), as amended, airport sponsors are required to give certain grant assurances in exchange for the receipt of federal grant assistance. *See* FAA Airport

Compliance Manual, Order No. 5190.6B, Chapter 4 (September 30, 2009). A statute, 49 U.S.C. § 47107, sets forth grant assurances that a sponsor must give in order to receive federal grant money, and also gives the FAA statutory authority to prescribe additional assurances for sponsors. *See* 49 U.S.C. §47107(g). Consequently, when the City received AIP funds pursuant to the Grant Agreements the City entered into with TxDOT, for and on behalf of the FAA, the City agreed to certain federal grant assurances.

31. Generally, the obligations imposed upon the City as airport sponsor pursuant to these federal grant assurances last for a period of twenty (20) years. *See* FAA Airport Compliance Manual, Order No. 5190.6B, Chapter 4. However, as to three grant assurances, the obligation continues without limit as long as the airport is used as a public use airport: Grant Assurance 23, *Exclusive Rights*; Grant Assurance 25, *Airport Revenues*; and Grant Assurance 30, *Civil Rights. Id*.

32. Grant Assurance 25, *Airport Revenues*, is codified at 49 U.S.C. §§47107(b) and 47133, which provide that "revenues generated by a public airport will be expended for the capital or operating costs of -- (a) The airport; (b) The local airport system; or (c) Other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property." Moreover, the City typically signs a "Certification of Airport Fund" as part of the Grant Agreements, in which the City certifies, in general, its compliance with Grant Assurance 25.

33. In 1999, the FAA issued *Policy and Procedures Concerning the Use of Airport Revenue*, 64 Fed. Reg. 7696, February 16, 1999 ("Revenue Use Policy"). Under the Revenue Use Policy, the duration of the revenue-use requirement is indefinite. *Revenue Use Policy* at 7699. Thus, because the City agreed to Grant Assurance 25 in the numerous Grant Agreements

it has entered into with TxDOT, for and on behalf of the FAA, the City is bound by the revenue-use requirement indefinitely, not just for a 20-year period, so long as the Airport Property is used as a public-use airport. In this case, this restriction will truly continue indefinitely, because the City is required under the 1947 Agreement to use the Airport Property for "public airport purposes" without a limit as to duration of time for such use.

34. However, contrary to the requirements of federal law, the City has been using, and continues to use, airport revenues for purposes other than those allowed under federal law.

### E. L-3's Business Operations

35. L-3 provides aircraft repair, maintenance and "systems integration" services, including aircraft modernization and the design, development, and integration of special-mission aircraft systems for military applications. L-3 is part of its parent L-3 Communication Corporation's "Integrated Systems Group," which is headquartered in Rockwall, Texas, and has worldwide operations with over 23,000 employees, thousands of whom are located at the Airport Property.

36. L-3's Mission Integration Division operation at the Airport Property in Greenville, Texas, provides comprehensive aircraft overhaul and single-source design, production, and integration of airborne special-mission systems, including the design, fabrication, installation, and testing of aircraft system components, and structural modifications. This L-3 division based on the Airport Property specializes in surveillance aircraft and aircraft-based intelligence, surveillance, and reconnaissance systems; command and control systems; and secure communications systems, with particular expertise in signal processing, electronic countermeasures, sensor development, and aircraft self-protection.

37. L-3 operates the portion of the Airport Property it leases from the City pursuant to the 1977 Lease as a federal government contractor, i.e., L-3's services are performed for or with

the involvement of the United States government and its agencies, including the Department of Defense and various branches of the Armed Services, primarily in connection with military aircraft. Moreover, the 1947 Agreement under the Surplus Property Act between the City and the United States of America provides that the United States has certain preferential rights to use the airport facilities, primarily runways, taxiways and the parking apron without charge. At any one time many members of the United States Armed Services are assigned to the Airport Property. The vast majority of L-3's gross revenues from its operations at the Airport Property are for the performance of services directly pursuant to contracts with the United States government and its agencies, and L-3 devotes almost all square footage at the facility exclusively to federal government contracts. Moreover, a number of the buildings are actually used by various branches of the armed forces as supply warehouses and supply depots. L-3 performs only a small volume of services for instrumentalities other than the federal government; however, even these services are performed pursuant to contracts in which the United States government plays an important role – contracts with foreign governmental customers.

38. Much, and in some cases all, of the operational details of L-3's aircraft services are deemed "classified" pursuant to federal law for national security purposes. Only persons with appropriate levels of security clearances and with an established need to know are authorized to receive factual information regarding L-3's services and operations.

39. L-3 employs approximately 6,200 persons at the Airport Property. L-3 is the largest employer and the most important single provider of economic activity in the Greenville area by a substantial margin.

40. All conditions precedent to this suit have been satisfied or have been waived.

## V. FIRST CLAIM: DECLARATORY RELIEF

41. Paragraphs 1-40 set forth above are hereby incorporated by reference.

42. The City refuses to admit or otherwise recognize that the Airport Property is subject to the Surplus Property Act and the restrictions of the 1947 Agreement. Also, City officials have been dismissive of federal obligations and restrictions applicable to the Airport Property. By way of example only, one official – who for years was the City official in charge of airport oversight – has downplayed the importance of L-3's maintenance of the runway and even went so far as to suggest that Majors Field could function with just a grass strip for a runway as opposed to a concrete runway. However, a grass strip is not a realistic option for the large military aircraft that currently use Majors Field and that need to be able to use Majors Field pursuant to the Surplus Property Act and other applicable federal law. Accordingly, an actual controversy exists.

43. L-3 therefore requests, pursuant to 28 U.S.C. § 2201, that the Court issue a declaratory judgment that:

   A. The Airport Property is subject to the Surplus Property Act;

   B. The Airport Property must be used indefinitely as a public use airport, as defined under federal law;

   C. The City must allow itinerant aircraft owned by the United States government, or operated by its agents or employees, to use the Airport Property in common with others; and

   D. All revenues from the Airport Property (excluding ad valorem property taxes) must be used for the operation and improvement of the Airport Property.

## VI. SECOND CLAIM: ACCOUNTING

44. Paragraphs 1- 43 set forth above are hereby incorporated by reference.

45. Pursuant to Grant Assurance 25 in the Grant Agreements and the Revenue Use Policy, revenues generated from airport operations are restricted in use. Such monies may be used, in short, only for the operation and improvement of the Airport Property.

46. Some, if not virtually all, of the airport revenue is deposited and maintained by the City in its airport fund. The City has been using, and continues to use, airport revenues for purposes other than those allowed under federal law.

47. The exact amounts of airport revenues used for other purposes, the dates of such uses, and the nature of such uses are unknown to L-3 and cannot be determined without an accounting of the uses made by the City of such airport revenue. An investigation of the City's airport fund, as well as of any other fund or account in which the City maintains or has deposited airport revenue, is necessary. The facts, accounts and funds are so complex that no adequate remedy exists at law.

48. Accordingly, the City should be ordered to render an accounting to L-3 of the airport revenue and the airport fund, or in the alternative, an auditor should be appointed to investigate and examine the City's use of airport revenue and the airport fund, and to report to the Court such findings.

## VII.  RESERVATION OF CLAIMS

49. L-3 reserves, for independent adjudication in a State Court Suit in the 354th Judicial District Court, Hunt County, Texas, any and all state law claims that L-3 has or may have against the City and its officials for violations of applicable Texas laws and regulations, including without limitation the claims that it has pending against the City and others in Case No. 76-399 pending before the Hunt County District Court.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, L-3 respectfully requests that defendant, City of Greenville, Texas, be summoned to appear and answer, and that upon final trial the Court grant the following relief:

A. Issue a declaratory judgment that the Airport Property is subject to the Surplus Property Act;

B. Issue a declaratory judgment that the Airport Property must be used indefinitely as a public use airport, as defined under federal law;

C. Issue a declaratory judgment that the City must allow itinerant aircraft owned by the United States government, or operated by its agents or employees, to use the Airport Property in common with others;

D. Issue a declaratory judgment that all revenues from the Airport Property (excluding ad valorem property taxes) must be used for the operation and improvement of the Airport Property;

E. Order an accounting as to the City's airport revenue and airport fund;

F. Award costs of court to L-3; and

G. Award such other relief, both general and special, at law or in equity, to which L-3 may show itself justly entitled.

Respectfully submitted,

s/ Vincent J. Hess

_____
Garry M. Miles
   State Bar No. 14043700
Vincent J. Hess
   State Bar No. 09549417
LOCKE LORD BISSELL & LIDDELL LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: 214.740.8000
Telecopy: 214.740.8800

ATTORNEYS FOR PLAINTIFF
L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.



Exhibit A